IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
JACKSON DIVISION

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| PREVALENCE HEALTH, LLC | ) | CASE NO. 09-02016-ee |
| | ) | **Chapter 11** |
| **Debtor** | ) | |
| | ) | |

### DEBTOR'S EMERGENCY MOTION FOR AN ORDER
### (A) ESTABLISHING SALES PROCEDURES IN CONNECTION WITH
### SOLICITATION OF OFFERS FOR SALE OF CERTAIN ASSETS;
### (B) APPROVING STALKING HORSE BID PROTECTION; AND
### (C) SETTING NOTICE OF OBJECTION DEADLINES AND DATES OF HEARINGS

Prevalence Health, LLC, the Debtor and debtor-in-possession herein (the "Debtor" or the "Company") files this *Emergency Motion for an Order (A) Establishing Sales Procedures in Connection with Solicitation of Offers for Sale of Certain Assets; (B) Approving Stalking Horse Bid Protection; and (C) Setting Notice of Objection Deadlines and Dates of Hearings* (the "Emergency Motion"). In support of this Emergency Motion, the Debtor respectfully states as follows:

### Introduction

1.      On June 9, 2009 (the "Petition Date"), the Debtor filed its Voluntary Petition under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code"). Pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code, Debtor is continuing to operate its business and manage its properties and assets as debtor-in-possession.

2.      An official committee of unsecured creditors (the "Committee") was appointed in this case by the United States Trustee on July 16, 2009 (Dkt. # 082).

### Jurisdiction and Venue

3. This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding under 28 U.S.C. § 157(b)(2)(A) and (M). Venue is proper in this Court under 28 U.S.C. §§ 1408 and 1409.

### Background

4. The Debtor offers its customers the convenience of free home delivery of their FDA-approved prescription drugs at competitive prices. Debtor's customers consist primarily of Medicare and Medicaid patients and Debtor's revenue stream is thereby largely dependent on payments from various state governments. Debtor is a licensed provider of multiple medication and disease management services and operates a home delivery pharmacy which services customers across the country.

5. Since the fall of 2008, Debtor has undertaken efforts to recapitalize and grow its business to achieve the necessary economies of scale to be profitable. None of the Debtor's efforts proved successful, however, and the Debtor was not able to raise sufficient funds or acquire strategic partners. Based on these setbacks, among others, Debtor's operations and profitability have suffered.

6. Given the Debtor's financial position and the economic realities of today's financial markets, the Debtor realizes that its best course of action is to sell its assets to maximize the recovery for its creditors, preserve the value of the business as a going concern, and to help ensure the opportunity of continued employment for many of Debtor's employees. These unfortunate events have forced the Debtor to file Chapter 11 in order to provide a viable means for selling the business as a going concern. The Debtor has sought to find one or more parties to purchase parts or all of its assets.

7. The Debtor has decided to consolidate its operations and will temporarily service its Florida Medicaid and Medicare customers out of its Zachary, Louisiana facility for the next 60 to 90 days until it can complete this sales process. This consolidation will permit the Debtor to concentrate its resources, both management and financial, in one fewer location, which will facilitate the Debtor's ability to continue to provide top-quality services to its customers.

8. Recognizing its fiduciary duties to the creditors and parties in interest, the Debtor believed it would be necessary, appropriate and preferable for the Debtor to retain an outside broker to coordinate and conduct the sale of the Debtor's business assets to provide specialized and knowledgeable assistance, as well as a disinterested, objective sales process. To that end, the Debtor accepted the recommendation of AmerisourceBergen Corporation ("ABC"), the largest creditor herein and a member of the Committee, concerning who should serve as the broker for the sale of the Debtor's business operations on a going concern basis. ABC recommended, and the Debtor has concurred, that Guy W. Stillwell ("Stillwell") of Pharmacy Consulting Associates ("PCA") should be retained as a broker for the Debtor's business.

9. On July 23, 2009, the Court entered its Order authorizing the Debtor to employ PCA as a consultant to assist it in the sale of substantially all of its assets to one or more buyers in one or more lots or as an entirety (Dkt. # 085).

10. This Emergency Motion seeks approval of a sales process with the desired goal of having a prompt sale of substantially all of the Debtor's Assets after a short, but intense, marketing effort with a clearly defined time frame. The result of this sales process will enable the Debtor to maximize the recovery for its creditors. The Debtor seeks approval for a definitive, Court-approved sale process, perhaps with a solicited stalking horse bidder, with the expectation that prospective

purchasers will competitively bid for the Assets and thus maximize the offers received for the Assets (as herein defined).

11.  The assets to be sold (the "Assets") are substantially all of its assets owned by the Debtor or in which the Debtor has any rights or interest and which are used in its business. The Assets include, but are not limited to, all or substantially all of the Debtor's:

    A.  Inventories and supplies;

    B.  Tangible personal property, including equipment, fixtures, supplies, furniture, furnishings, computers, applications software, communications equipment, and databases;

    C.  Unexpired leases;

    D.  Permits, licenses and/or Provider's numbers;

    E.  Executory contracts;

    F.  Intangible property, including general intangibles, customer lists and intellectual property; and

    G.  Books, records, files and data.

12.  Excluded from Assets being sold are cash, deposits, excluded unexpired leases and executory contracts, rights under insurance policies, tax claims, tax returns and financial information and records necessary to prepare such returns, and any claims or causes of action, including those vested in the Debtor under Chapter 5 of the Bankruptcy Code (the "Excluded Assets").

13.  Accordingly, the Debtor seeks approval of the sale process for the Assets that is set forth herein. The Debtor believes that the sales procedures proposed herein (the "Sales Procedures") will provide a fair, open process and will lead to the highest and best purchase offer or offers for the Assets.

14. Generally, under the Sales Procedures, PCA will be responsible for marketing the Debtor's Assets and notifying prospective purchasers of the deadline to submit Qualified Offers (as defined herein) to purchase the Assets. The Debtor and PCA will present to the Court for approval one or more offers for all or a part of the Assets.

15. Pursuant to a motion to sell substantially all of the assets of the Debtor outside the ordinary course of business, free and clear of liens, claims, interests and encumbrances, with such liens, claims, interests and encumbrances attaching to the proceeds of sale in the same order and priority and to the same extent as they attached to the property sold (the "Sale Motion"), the Debtor will seek authority to sell the Assets free and clear of any liens, claims, and encumbrances to one or more buyers.

## SALE PROCEDURES

16. In this Emergency Motion, the Debtor seeks entry of an order pursuant to sections 105 and 363 and 365 of the Bankruptcy Code (a) approving the procedures and timetable by which the Assets will be marketed, auctioned and potentially sold, (b) approving stalking horse bidder protections, and (c) giving notice to creditors and parties in interest of the applicable deadlines and dates and times of hearings.

17. The Debtor seeks approval of the following Sales Procedures:

    A.    Qualified Bidders.

        (1) Qualified Bidders. The Debtor, by and through PCA will seek to identify and recognize a number of bidders as qualified to bid on the Assets, based on, among other things, statements of interest and certain financial information demonstrating to the Debtor's satisfaction the bidders' financial ability to consummate a purchase of the Assets (each, a "Qualified Bidder"). PCA shall notify each Qualified Bidder in writing of its designation as a Qualified Bidder and its ability to participate in the sales process. Any other party interested in purchasing some or all of the Assets may seek to become a Qualified Bidder and participate in the bidding process by notifying PCA (at the address set forth in Section (A)(5)

below) prior to the Bid Deadline (as such term is defined below) of its interest in bidding on some or all of the Assets and providing such information as may be required by PCA and the Debtor to demonstrate such potential bidder's financial ability to consummate a purchase of the applicable Assets. PCA, in its discretion after consultation with the Debtor may determine which additional parties considered to be a Qualified Bidder. Each additional Qualified Bidder will be notified in writing of its designation as a Qualified Bidder.

(2)    Due Diligence. The Debtor will afford any Qualified Bidder such due diligence access or additional information as may be reasonably requested by the Qualified Bidder and that the Debtor and PCA determine, in their business judgment, to be reasonable and appropriate. The Debtor will coordinate all reasonable requests for additional information and due diligence access from any Qualified Bidder through PCA. Unless otherwise determined by the PCA in its discretion after consultation with the Debtor, the availability of additional due diligence to a Qualified Bidder will cease from and after the Bid Deadline.

(3)    Letter of Intent. Once a Qualified Bidder determines the Assets on which it will submit a bid, the Qualified Bidder may prepare and submit to PCA an executed Letter of Intent ("LOI") describing such Assets sought to be purchased and the purchase price for those assets.

(4)    Non-Qualified Bidders. Any potential bidder that is not designated as a Qualified Bidder in accordance with the foregoing shall be disqualified from further participation in the bidding process (a "Non-Qualified Bidder"). A Non-Qualified Bidder will not be permitted to conduct due diligence, make a bid for any of the Assets under the Asset Sale Procedures or participate in the Auction (as such term is defined below).

(5)    Bid Deadline. Not later than 4:00 p.m., Central Time, on Thursday, August 13, 2009 (or the date of any last extension granted by the Debtor in its discretion, the "Bid Deadline"), a Qualified Bidder that desires to make a bid shall deliver a written copy of its bid as described below in Section B(2) to Guy W. Stillwell, President, Pharmacy Consulting Associates, 2647 Cottage Grove Place, Woodbury, MN 55129. PCA will distribute a copy of each bid received to the Debtor, counsel for the Debtor and to the Committee.

B.    Bid Requirements.

(1)    Assets.

A Qualified Bidder may make a bid for the Assets or some portion thereof. PCA reserves the right, in its discretion after consultation with the Debtor to consider a Qualified Bid for combinations of the Assets, but are not required to do so.

(2)    Form and Content of Bid.

A bid is a signed Asset Purchase Agreement ("APA") from a Qualified Bidder in substantially the same form as attached hereto as Exhibit "A" or otherwise acceptable to the Debtor stating that:

(a)    The Qualified Bidder offers to purchase the specified Assets for cash. The APA must clearly delineate all components of the proposed purchase price and the price offered for each component of the Assets;

(b)    The Qualified Bidder's offer is irrevocable; and

(c)    The Qualified Bidder's offer is subject to approval by the Bankruptcy Court, but is not subject to any further due diligence, corporate or board approval, or a financing contingency and does not contain any other material condition precedent to closing.

(3)    Required Supporting Materials. A Qualified Bidder shall accompany its bid with (a) written evidence of available cash, a commitment for financing or ability to obtain a satisfactory financing commitment if selected as the Successful Bidder and such other evidence of ability to consummate the transaction as PCA may reasonably request; (b) a copy of a resolution or similar document demonstrating the authority of the Qualified Bidder to make a binding and irrevocable bid on the terms proposed.

(4)    Required Good Faith Deposit. By the Bid Deadline, a Qualified Bidder must deposit with PCA a good faith deposit (the "Good Faith Deposit") in the amount of the lesser of five percent (5%) of the amount of its bid or $50,000.00. The Good Faith Deposit must be made by certified check or wire transfer and will be held by PCA subject to paragraph E herein.

(5)    Qualified Bid. Subject to the terms of Section C below, a bid received by the Bid Deadline from a Qualified Bidder that meets the requirements in Section B is considered a "Qualified Bid." The Debtor reserves the right to waive noncompliance with any one or more of these requirements and deem any otherwise non-qualifying bid to be a Qualified Bid. A Qualified Bid will be evaluated based upon factors such as: (a) the amount of the Qualified Bid; (b) the fair net value to be provided to the Debtor under the Qualified Bid; (c) the ability of the Qualified Bidder to close the proposed sale transaction without delay; and (d) any other factors that the Debtor and PCA may deem relevant.

(6)    Rejection of Bid. Notwithstanding the foregoing, PCA shall be entitled to reject any bid, in its discretion after consultation with the Debtor if the bid:

(a)    is on terms that are materially more burdensome or conditional than the terms of this Emergency Motion;

    (b) requires any indemnification of such Qualified Bidder in its APA;

    (c) is not received by the Bid Deadline;

    (d) includes a non-cash instrument or similar consideration;

    (e) that does not satisfy Section B; or

    (f) contains any material conditions to closing.

Any bid rejected pursuant to this Section B(6) shall be deemed not to be a Qualified Bid.

  (7) <u>Reserve Amount</u>. There is no minimum bid amount for the Assets, however, all parties reserve the right to object to the approval of the sale of the Assets.

  (8) <u>Bid Negotiations</u>. Upon the receipt of Qualified Bids, PCA may negotiate with one or more Qualified Bidders regarding the terms of the applicable Qualified Bids.

  (9) <u>Selection of Successful Bidder</u>. PCA, in consultation with the Debtor and the Committee, shall identify the highest and best bid(s) for the Assets to submit to the Court for approval.

C. <u>Sale Motion.</u>

The Debtor will prepare and file a Sale Motion on or before August 17, 2009 in which it seeks authority to sell the Assets to the Successful Bidder(s). The Sale Motion will seek the entry of a final order from the Bankruptcy Court approving and authorizing the proposed sale to the Successful Bidder(s) on terms and conditions substantially consistent with and in accordance with the Sale Procedures and the APA.

D. <u>Objections.</u>

Any objection to the Sale Motion must be filed on or before 5:00 p.m. (central time) on August 31, 2009.

E. <u>Sale Hearing</u>.

  (1) <u>Preliminary Hearing</u>. A preliminary hearing with respect to the Sale Motion will be held at 9:00 a.m. (central time) on September 1, 2009 at the United States Bankruptcy Court, Southern District of Mississippi, United States Bankruptcy Courthouse, Room 106, 100 East Capitol Street, Jackson, MS 39201.

(2)    Final Hearing. A final hearing on the Sale Motion will be held on Wednesday, September 2, 2009 at 9:30 a.m. at the United States Bankruptcy Court, Southern District of Mississippi, United States Bankruptcy Courthouse, Room 106, 100 East Capitol Street, Jackson, MS 39201.

F.    Return of Good Faith Deposit.

(1)    The Good Faith Deposit, together with all interest accrued thereon, if any, shall be returned to any bidder whose bid was not the Successful Bid.

(2)    The Good Faith Deposit submitted by the Successful Bidder, together with all interest thereon, if any, shall be applied against the payment of the purchase price, as defined in the relevant asset purchase agreement, at the closing of the sale to the Successful Bidder.

G.    Break-up Fee for Stalking Horse Bidder.

(1)    The Debtor and PCA may seek, but are not required, to secure a "stalking horse" bidder (the "Stalking Horse Bidder"). To secure a Stalking Horse Bidder, the Debtor and PCA request that a break-up fee of one-and-a-half percent (1.5%), inclusive of expenses ("Break-up Fee") be approved.

(2)    The Break-up Fee shall be paid to the Stalking Horse Bidder concurrently with the consummation and closing of a sale to a party other than the Stalking Horse Bidder that is approved by the Court.

H.    Closing.

(1)    The Closing of the sale(s) of the Assets will occur on or before September 30, 2009, unless extended by mutual agreement of the parties.

(2)    The Closing shall be held in the offices of Butler, Snow, O'Mara, Stevens & Cannada, PLLC, 17th Floor, Regions Plaza, 210 East Capitol Street, Jackson, Mississippi, or at such other location as the parties may agree.

I.    Proceeds of Sale.

The Debtor shall place the net proceeds of the sale of the Assets in a separate interest-bearing trust account to be established by the Debtor-in-Possession, which moneys shall be disbursed only upon further Order of this Court, after notice and a hearing to creditors and parties in interest.

J.  **Modification of Timetable.**

The Debtor, in consultation with PCA and the Committee, may modify the timetable set forth herein if doing so is in the best interests of the bankruptcy estate and in order to maximize the value realized for the Assets being sold herein.

18. The Sale Procedures set forth in this Emergency Motion should be approved because the requested procedures: (i) are the product of the Debtor's sound business judgment; (ii) will foster and enhance bidding and thus maximize the offers for the Assets; and (iii) are in the best interest of the Debtor's estate and its creditors.

19. The Sale Procedures are the result of extensive efforts by the Debtor and its professionals, including PCA. The experience of PCA and the Debtor's counsel factored into the development of the proposed Sale Procedures. Accordingly, the Sale Procedures represent a sound business decision, made in good faith and with full information. Potential bidders did not have specific input into the development of the Sale Procedures, and thus the Sale Procedures were not subject to manipulation or self-dealing.

20. The Sale Procedures should be approved as the procedures will foster and enhance the bidding process resulting in the maximization of potential bids. Certainly, there is no guaranty that the Sales Procedures will result in an offer deemed to be acceptable by the Debtor and PCA. However, such a result would not be the fault of the Sales Procedures. The Sales Procedures clearly delineate a structured process for the solicitation, negotiation and proposition of bids, and auction, for the Assets. Since prospective purchasers will receive notice of the procedures and certain relevant dates, these prospective bidders will have full notice of the ground rules to bid, or not bid, on the Assets. The Debtor believes that this finality will cause prospective bidders to "step up to the table" and present bids that would enable their participation at the Auction. The openness of the

process will ensure a fair process for all potential bidders. Accordingly, the Debtor asserts that the Sales Procedures will maximize potential offers by providing a fair, open and structured process.

21.    The anticipated result of implementation of the Sale Procedures – namely the sale of the Assets to a Successful Bidder – is in the best interest of the Debtor's estate and its creditors. Courts have concluded that sales procedures should be approved when the proposed transaction is in the best interest of the estate, creditors, equity holders and other parties involved, and maximizes value for the estate. *See In re Tiara Motor Coach Corp.,* 212 B.R. 133, 137 (Bankr. N.D. Ill. 1997); *In re S.N.A. Nut Co.,* 186 B.R. 98, 104 (Bankr. N.D. Ill 1995); *In re American West Airlines, Inc.,* 166 B.R. 908, 915 (Bankr. D. Ariz. 1994).

22.    As noted earlier, the process will maximize the offers for the Assets. While the Debtor believes that the sale of the Assets is in the best interest of the bankruptcy estate, until the process has played out, the Debtor cannot predict the final outcome. However, the process should be permitted to proceed in order to determine the highest and best offers of any and all prospective bidders. The proposed Sale Procedures will accomplish that goal and thus the approval of the Sale Procedures is in the best interests of the bankruptcy estate and its creditors.

23.    The Debtor respectfully requests the Court to set the Emergency Motion for a hearing at its earliest possible opportunity, so that the Sales Procedures can be considered as expeditiously as possible, in order to give creditors and parties in interest as much notice as is reasonable under the circumstances of the existence of the Sales Procedures, and the approval (or denial) thereof.

24.    Other grounds for granting the Emergency Motion may be assigned upon a hearing hereof.

WHEREFORE, PREMISES CONSIDERED, the Debtor respectfully requests the entry of an Order (A) Establishing Sales Procedures in Connection with Solicitation of Offers for Sale of

Certain Assets; (B) Approving Stalking Horse Bid Protection; and (C) Setting Notice of Objection Deadlines and Dates of Hearings. The Debtor prays for other such general and specific relief as this Court may deem just.

THIS, the 31st day of July, 2009.

>Respectfully submitted,
>
>PREVALENCE HEALTH, LLC
>
>By: /s *Stephen W. Rosenblatt*
>    STEPHEN W. ROSENBLATT (MB # 5676)
>    PAUL M. ELLIS (MB # 102259)

OF COUNSEL:

BUTLER, SNOW, O'MARA, STEVENS & CANNADA, PLLC
17th Floor, Regions Plaza
210 East Capitol Street
Jackson, MS 39201
Post Office Box 22567
Jackson, MS 39225-2567
Telephone: (601) 948-5711
Fax: (601) 985-4500
steve.rosenblatt@butlersnow.com
paul.ellis@butlersnow.com

## CERTIFICATE OF SERVICE

I certify that the foregoing pleading was filed electronically through the Court's ECF system and served electronically on all parties enlisted to receive service electronically and was separately served by United States Mail, postage prepaid, or by e-mail on the following:

>Ronald H. McAlpin, Esq.
>Trial Attorney, Office of the United States Trustee
>A. H. McCoy Federal Building, Suite 706
>100 W. Capitol Street
>Jackson, MS 39269
>Ronald.McAlpin@USDOJ.gov

Mr. Phillip Theodore
A&I Solutions, LLC
256 Seaboard Lane
Franklin, TN 37067
ptheodore@aandisolutions.com

Morton R. Branzburg, Esq.
AmerisourceBergen Drug Company
260 S. Broad Street
Philadelphia, P A 19102
mbranzburg@klehr.com

Mr. Brian T. O'Neill
DDP Medical Diamond Diabetic Products
11800 28th Street
Saint Petersburg, FL 33716
brain@ddpmedical.com

Mr. Alan H. Walters
First Commercial Bank
1300 Meadowbrook Rd.
Jackson, MS 39211
awalters@firstcommercialbk.com

Mr. James G. Lang
Hamilton Partners, Inc.
300 Park Boulevard, Suite 500
Itasca, IL 60143
jl@hpre.com

SO CERTIFIED, this the 31st day of July, 2009.

/s/ Stephen W. Rosenblatt

Jackson 4185119v2