BANKRUPTCY COURT
DISTRICT OF MS
FILED

09 SEP 11 PM 1: 11

DANNY L. MILLER
CLERK
BY_____ DEPUTY

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
JACKSON DIVISION

In re:                                          )
                                                )
PREVALENCE HEALTH, LLC                          )      CASE NO. 09-0216-ee
                                                )      Chapter 11
        Debtor                                  )
                                                )

## NOTICE OF OBJECTION TO THE SALE MOTION

COMES NOW, MedExpressFL in this matter with objections to the Sale Motion.

For purposes of this Motion, all capitalized terms herein shall have the meanings ascribed in the Debtor's Motion to Approve Sale of Assets Free and Clear of Liens, Claims, and Interests and Assumption and Assignment of Executory Contracts dated August 28, 2009 (the "Sale Motion") and in the pertinent Asset Purchase Agreements. For purposes of this Motion, paragraphs 1 through 11 contained in the Sale Motion are incorporated by reference herein.

1. The Post Entity has created MedExpress Health of Florida, LLC ("MedExpressFL") on behalf of and in substitution for David B. Post ("Post") and the Post Entity to undertake this transaction.

2. Though Post is not a pharmacist, Post is the owner of a North Carolina corporation that operates a mail order pharmacy in North Carolina and is familiar with the rules and regulations necessary to operate a pharmacy.

3. On August 28, 2009, the Debtor recommended that MedExpressFL's offer to acquire certain assets of the Debtor be accepted.

4. The Debtor's operations in Davie, Florida were closed on or about August 13, 2009 and its Florida patients have been served since then from the Debtor's facility in Zachary, Louisiana.

5. The Debtor's Florida assets include, but are not limited to, the following:

    a. Various permits and licenses allowing it to operate a pharmacy in Florida,

    b. Florida Medicaid patient base and files,

    c. Florida Medicare Part D patient base and files,

    d. Furniture and fixtures located in Davie, Florida,

    e. ScriptMeds pharmacy software, and

    f. Books, records, and patient files and patient data including the full patient files of former patients who are no longer customers of Debtor.

6. During Post's due diligence process, Debtor's CEO and COO promised to provide MedExpressFL with the assistance necessary to have a "seamless transition." Since August 28, 2009, Debtor has not responded to MedExpressFL's repeated inquiries regarding transition issues.

7. In its Order establishing Sale Procedures dated August 13, 2009, this court made findings that included:

    a. Paragraph 4: "That Debtor has decided to consolidate its operations and will service its Florida Medicaid and Medicare customers out of its Zachary, Louisiana facility for the next 60 to 90 days until it can complete this sales process."

    b. Paragraph 13.J. "The Debtor, in consultation with PCA and the Committee, may modify the timetable set forth herein if doing so is in the best interests of the bankruptcy estate and in order to maximize the value realized for the Assets being sold herein."

8. Upon information and belief, Debtor's permit to operate a pharmacy in Florida been revoked. If the Florida patient base has a break in service for 30-60 days while MedExpressFL

applies for a pharmacy permit and goes through the process of re-opening a pharmacy to serve the Florida patients, the entire Florida patient base will evaporate completely.

9. It is neither reasonable nor practical from a business perspective that MedExpress can open and get a mail order pharmacy operational between the September 14, 2009 Sale Motion and the proposed September 30, 2009 Closing Date because it simply requires more time to perform the following tasks necessary to open a pharmacy:

      a. Gain familiarity, other than receiving files, with the operations and service provided to chronically ill patients (particularly when there has been a complete lack of cooperation from the selling Debtor);

      b. Obtain a valid pharmacy permit and undergoing a site visit by the Florida Board of Pharmacy;

      c. Obtain Medicare and Medicaid provider numbers;

      d. Establish contracts with Medicare Part D providers;

      e. Establish contracts with other insurance providers;

      f. Enter a lease and upfit a location that meets both the requirements of a mail order pharmacy and the requirements of the Florida Board of Pharmacy requirements;

      g. Hire or promise employment to a person to serve as Pharmacist in Charge and perform all the necessary background checks;

      h. Hire and train a variety of support personnel including advertising, performing interviews, checking work history and references, and obtaining criminal background checks;

      i. Install pharmacy software and transfer electronic patient data (MedExpress uses one of the most widely used software systems in the country, RX30 by

Transaction Data Systems. Its CEO informed MedExpress that an installation requires 4 to 6 weeks);

j.   Ordering and getting into place the necessary inventory AFTER the Board of Pharmacy site visit;

k.   Install the necessary computer technology, telephone systems, and security systems;

l.   Enter agreements with courier services;

10. Of critical importance to any pharmacy operation is an electronic transfer of patient files and prescription information. On September 8, 2009, Debtor informed MedExpressFL that it would not provide electronic files until after closing, thereby making it virtually impossible for MedExpress to fulfill its duties to the Florida patients.

11. A mail order pharmacy operating in the model that both Debtor and MedExpressFL operate is substantially different than a "walk-in" retail pharmacy and requires more time to start-up because patients are called approximately 10 days prior to shipment. Given Debtor's lack of cooperation to date, it is not reasonable for MedExpressFL to rely upon Debtor to properly communicate with Florida patients regarding prescriptions that MedExpressFL will be responsible for filling and to communicate to MedExpressFL about the inventory that will be required to fulfill those prescriptions.

12. It is not reasonable and makes no business sense to try to open or re-start a pharmacy in a period of 14 days when all the evidence in the market indicates that it typically requires 60 to 90 days or more under normal circumstances to transition a pharmacy when a Buyer and a Seller are cooperative.

13. In support of this Motion, attached are the following affidavits from pharmacy professionals stating that it is not possible to open or transition a pharmacy in 14 days and that such a process generally requires a cooperative effort with a minimum of 60-90 days:

    a. David B. Post, managing member of MedExpressFL and the CEO of MedExpressNC;

    b. Jonathan A. Post, a member of MedExpressFL and the COO of MedExpressNC with an email from the VP for Transition and Strategy for Cardinal Health, Inc., one of the largest health care companies in the country and ranked as the 19th largest company in the US by Fortune Magazine;

    c. Donald L. Lambert, the former Director of Health Business Development for the southeastern United States for Walgreens;

    d. Steve Wubker, CEO/President of Transaction Data Systems, the licensor of one of the most widely used pharmacy management software packages in the nation and the licensor to MedExpressNC;

    e. Mike Halfen, a Florida pharmacist who has been engaged in the transition of four pharmacies in Florida.

14. Because of a lack of clarity regarding the allocation of each Buyer's purchase price and certain assets that both Buyers are seeking, Debtor's counsel sent notice on September 9, 2009 that he would provide a "pricing sheet" to be utilized for that allocation. Inasmuch as that pricing sheet has not been provided at the time of this filing, MedExpressFL is unable to address any items herein with which it may object.

WHEREFORE, MedExpressFL prays for the following relief:

1.   That the Closing Date for the transfer of the Florida Medicaid patient base be deferred until November 11, 2009, that is, 90 days after Order establishing Sale Procedures when this Court found that Florida patients were being served out of Louisiana.

2.   That MedExpress be permitted, beginning 14 days prior to closing, to contact the patients for whom it will be filling their prescription needs after Closing.

3.   That MedExpress be awarded the ScriptMeds software license and documentation and that it be transferred to MedExpress at least 14 days prior to Closing so that it will be able to call and serve the Florida patients as of the Closing Date.

4.   That the Florida Medicare Part D prescription files be awarded to MedExpress and that SafeMeds, or any other Buyer of Debtor's non-Florida assets, be prohibited from contacting those patients for a period of six months after closing;

5.   That MedExpress be permitted to move the property and equipment located in Davie, Florida at least 15 days prior to closing so that it can set up its pharmacy;

6.   That Debtor provide MedExpress with drug usage reports on a weekly basis at least 30 days prior to Closing for the prior 90 days so that MedExpress can get an appropriate beginning inventory in place prior to its obligation to fulfill prescriptions.

7.   That debtor provide electronic patient files or at least sample data files to begin the data conversion, testing, and quality control for the data transfer process at least XX days before closing.

8.   That Debtor provide, along with all current patient files and data, all the files and data from former patients that Debtor formerly served but is no longer serving.

9.   That the Court provide the Buyers with adequate time to resolve any differences over the allocation of their bid prices.

10. For such other relief as this Court deems just and proper.

This the 11 day of September, 2009.

Respectfully submitted,

MEDEXPRESS HEALTH OF FLORIDA, LLC

_____
David B. Post

CERTIFICATE OF SERVICE

I certify that the foregoing pleading was filed by delivery to the Clerk of the United States Bankruptcy Court in Room 101, 100 East Capitol Street, Jackson, MS 39201 and was separately served by email on the following persons:

Stephen W. Rosenblatt
Butler, Snow, O'Mara, Stevens & Cannada, PLLC
PO Box 22567
Jackson, MS 39225
Steve.rosenblatt@butlersnow.com
Paul.ellis@butlersnow.com

Ronald H. McAlpin, Esq.
Trial Attorney, Office of the United States Trustee
A.H. McCoy Federal Building, Suite 706
100 West Capitol Street
Jackson, MS 39269
Ronald.McAlpin@USDOJ.gov

SO CERTIFIED, this the 11 day of September, 2009.

_____
David B. Post

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
JACKSON DIVISION

In re:                                                      )
                                                            )
PREVALENCE HEALTH, LLC                                      )        CASE NO. 09-0216-ee
                                                            )        Chapter 11
        Debtor                                              )
_____            )

AFFIDAVIT
Of
David B. Post

NOW COMES the affiant who avers and says under oath as follows

1. I am not a pharmacist but I am the majority owner of two pharmacies in North
Carolina, one of which is a mail order pharmacy named MedExpress Pharmacy, Ltd.
("MedExpressNC").

2. I am familiar with the rules and regulations necessary to open and operate a pharmacy.

3. I have been involved in the acquisition of two pharmacies and the physical movement
of those pharmacies three times.

4. I have created an entity in Florida known as MedExpress Health of Florida, LLC
("MedExpressFL") to acquire the Florida assets of the Debtor. I am the managing member.

5. At this time, I do not own and am not affiliated with a pharmacy in Florida.

6. On or about August 14, 2009, Guy Stillwell of PCA ("Stillwell") was referred to me
because of the similarities of the operations between MedExpressNC and the Debtor.

7. On August 15, 2009, Stillwell and I engaged in a conversation regarding the possibility
of my acquiring all or part of the Debtor's business, and Stillwell provided various documents
for me to examine.

8. On August 15, 2009 I informed Stillwell that my only interest was in acquiring the Florida assets of the Debtor. On several occasions thereafter, Stillwell asked me to acquire all the assets and operations of the Debtor and on each occasion, I stated that my only interest was in acquiring the Florida assets and operations.

9. On August 15, 2009 and regularly thereafter until August 28, 2009, I informed Stillwell of my intent not to utilize the Debtor's pharmacy location in Davie, Florida. I asked Stillwell if the permit was transferable to another location in Florida, and Stillwell assured me that our company could operate at any location in Florida. In fact, based upon Stillwell's representations that my bid would prevail for the purchase of the Florida assets, I spent from August 27, 2009 until September 3, 2009 in central Florida searching for a site to operate a pharmacy.

10. In my experience, the process of opening or transitioning a pharmacy requires, among other activities, the following:

    a. Obtaining a location in which to operate;

    b. Fixing up the location to ensure proper workflow for the particular type of pharmacy and to meet the requirements of the Board of Pharmacy;

    c. Hiring a pharmacist licensed in the State of Florida to serve as the "Pharmacist in Charge," which includes interviewing, checking job histories, and obtaining criminal background checks for which we use a company known as Intelius. In addition, any such pharmacist who might wish to accept an offer that we would make invariably must give notice of termination to his or her existing employer.

    d. Hiring and training a variety of personnel which includes interviewing, checking job history and performance and references, and obtaining a criminal background checks for which we use a company known as Intelius.

e.  Getting finger prints of the Pharmacist-in-Charge and the principal business owners and having them approved by the Board of Pharmacy.

f.  Filing an application with the Board of Pharmacy for a permit;

g.  Filing applications with various state and federal governmental agencies for permits and licenses;

h.  Undergoing a site inspection by the Board of Pharmacy;

i.  Ordering and getting inventory in place AFTER the Board of Pharmacy site inspection;

j.  Establishing contracts with insurance companies and other 3rd party payers;

k.  Installing computer systems;

l.  Installing pharmacy software on the computer systems;

m.  Installing telephone and security systems.

11. Without any assurance that it will, in fact, be approved by this Court as the acquirer of the Debtor's Florida assets, MedExpressFL could not reasonably have been expected to undertake or obligate itself to any of the activities listed above.

12. On August 15, 2009 and regularly thereafter until August 28, 2009, Stillwell assured me that the Debtor could assign to MedExpressFL its Florida permits pursuant to a special power of attorney.

13. Between August 15 and August 27, Stillwell and I negotiated various prices for the Florida assets. Stillwell informed me that I was the best fit for the Debtor's operational model. In a telephone conversation on August 22, Stillwell told me that the entire process was too much trouble and that he had decided to sell all the prescription files to Walgreen for $1 each and be done with it.

14. After I submitted my original bid, Stillwell informed me that I had to increase my bid because other bidders were offering more than I was. When I raised my bid, he told me again that I had to raise my bid which I did not do. Upon information and belief, my original bid exceeded the bid of SafeMeds which was the successful bidder of the non-Florida assets of the Debtor. I believe I was the only party bidding on the Florida assets, or at least on the Florida Medicaid-related assets, and that Stillwell was having me bid against myself.

15. On August 24, 25, and 26, I visited the Debtor's facilities and operations in Jackson, MS, Zachary, LA, and Davie, FL and engaged in conversations with the CEO and COO of the Debtor. Both Debtor and MedExpressNC use a business model in which they call their patients approximately 10 days in advance of shipment of their monthly medications. The Debtor's CEO and COO promised to assist me with a transition of the Debtor's patient files if I decided to acquire the Debtor's Florida operations. Among other promises, Debtor's COO said that she could "just make a few calls" and have pharmacists and pharmacy technicians available to work immediately both in Davie, Florida and at other locations in Florida. I informed Debtor's CEO and COO that I did not intend to operate MedExpressFL out of its Davie, Florida location...

16. Stillwell told me several times that the Debtor had the authority to continue to serve the Florida patient base out of its Louisiana facility for a period of 60-90 days.

17. In reliance upon (a) Stillwell's and Debtor's counsel's representations that the Debtor's pharmacy licenses and permits could be assigned with a special power of attorney, and (b) Debtor's promise to assist in an open and orderly transition, I submitted my APA on August 27, 2009 with the expectation that a reasonable and doable transition period would be provided.

18. On August 28, 2009, I received a copy of the Notice of Motion to Approve Sale of Assets indicating that the Debtor had recommended that my offer be accepted and that the Sale Motion would be held on September 16 with closing on September 30.

19. On August 28 and 29, 2009, I made several efforts to communicate with Debtor's CEO and COO to initiate up a transition schedule, but received no response.

20. On August 31, 2009, Debtor's counsel sent me an email indicating that it was necessary to get the APA's "fine-tuned" and that a number of contingencies had to be resolved before any transition planning could be undertaken.

21. On August 31, 2009, I sent an email to Debtor's counsel raising a number of transition issues.

22. On September 1, 2009, Debtor's counsel, Debtor's CEO (who is also a bidder for the Debtor's non-Florida assets), counsel to the Creditors' Committee, Stillwell, I, and various other parties engaged in a conference call to address my concerns about a transition. During that call, Stillwell, Debtor's counsel, and counsel to the Creditors' Committee informed me that:

   a. MedExpressFL would be required to operate with the Debtor's pharmacy permit out of Davie, Florida until MedExpressFL could obtain its own pharmacy license from the Florida Board of Pharmacy. (On that call and on another conference call on September 8, 2009, Stillwell stated that he "assumed" that MedExpressFL intended to operate in Davie, Florida despite my informing him regularly that we intended to move to another location and that we were actively seeking a site and making arrangements for the movement of computers and fixtures.)

   b. The added cost of operating out of Davie was "just a cost of doing business."

    c.  MedExpressFL could operate a pharmacy in Florida using Debtor's permits and licenses "with a special power of attorney with no problem."

    d.  A transition could not begin until after the Sale Motion on September 16, 2009.

    e.  All that had to be done was to "hit the switch" and MedExpressFL could begin to fill prescriptions out of Florida the day after the Closing Date.

    f.  Debtor's employees were too busy to assist MedExpressFL in a transition;

    g.  Debtor would contact the Florida patients and transfer the files, perhaps in hard copy, for fulfillment on the date of closing.

23. During the conference call of September 1, 2009, I said that a pharmacy transition could not be done in fourteen days but the others on the call indicted that it was "not a problem."

24. On September 1 and 2, 2009, I sent additional emails to all parties on the conference call again addressing various transition issues and received no response.

25. Upon information and belief, on September 3, 2009, my brother, Jon Post, Chief Operating Officer of MedExpressNC and a member of MedExpressFL, called the Florida Board of Pharmacy to inquire about any necessary filings would be necessary to operate MedExpressFL with a special power of attorney from Debtor, to re-open the Davie, Florida facility on a temporary basis, and to understand the mechanics involved in operating in one location while applying for a permit for another location. Upon information and belief, a representative of the Florida Board of Pharmacy (named Dinah Skrnich) informed Jon Post that Debtor's pharmacy license had been revoked and that it could not operate a pharmacy in Florida without applying for a new permit.

26. On September 3, 2009, I sent an email to Stillwell, Debtor's counsel, Debtor CEO, and counsel for the Creditor's Committee entitled "CRITICAL IMPORTANCE" with notice that the Debtor's pharmacy permit had been revoked and received no response.

27. Because Debtor lacks a valid pharmacy license in Florida, an assignment of Florida licenses, permits, and script files is of no value if MedExpressFL lacks the legal authority to dispense from Florida. A break in service to the Florida patients will result in a complete evaporation of the entire patient base and any value related thereto.

28. On September 9, 2009, counsel for Debtor, counsel for the Creditors' Committee, Stillwell, I, and others engaged in another conference call to address both transition issues and a reason for having closing on September 30 as opposed to a later date. The only explanation for closing on September 30, 2009 was that "it had to be done by then." During that call, I mentioned that Cardinal Health (MedExpress' primary vendor) professionals informed us that a 14-day transition was not possible. Stillwell said that he had been Director of Acquisitions at Cardinal and that he had done it hundreds of times. Upon information and belief, Stillwell has never been Director of Acquisitions for Cardinal though he has apparently done work with the Cardinal franchise retail stores known as The Medicine Shoppe.

29. I have retained the services of and consulted with professionals with transition experience from Cardinal Health Systems, Walgreens, other pharmacies in Florida, the MedExpress pharmacy software licensor, and have talked to our pharmacy software vendors. All have informed me that it is not reasonably possible to transition a pharmacy, virtually from scratch including prescription files, within 14 days.

30. SafeMeds which is controlled by insiders of the Debtor, does not have to deal with the transition and licensing concerns faced by MedExpress since it is operating in Louisiana and

Mississippi with operational licenses in effect and since, upon information and belief, the employees of Debtor will simply show up at work the day after closing and continue "business as usual" in the same location albeit with a different name.

31. MedExpressFL and I have received no cooperation from Debtor with respect to a transition.

32. It appears to me that the Debtor is trying to foist a declining asset upon MedExpressFL and without any effort to allow sufficient time for a normal and appropriate startup.

33. In my opinion and based on my experience, it is not reasonable or possible for MedExpressFL to take over the Florida pharmacy operations from Debtor under the current circumstances within 14 days. In my opinion, it will require at least 45 days to have a pharmacy operational.

34. Although MedExpress has offered to pay an amount for the Florida assets which is approximately twice the amount SafeMeds offered for the non-Florida assets on a per prescription basis, MedExpress is willing to move forward if it is provided sufficient time to re-start the business in Florida.

## VERIFICATION

I, David B. Post, after first being duly sworn, deposes and says: That I am the affiant in the attached affidavit. I have read the affidavit and know the contents thereof and the same is true of my own knowledge, except as to those things and matters stated on information and belief, and as to those, I believe them to be true.

_____
David B. Post

State of North Carolina
County of Rowan

SWORN TO AND SUBSCRIBED TO BEFORE ME, by David B. Post, this, the _11th_ day of
September, 2009.

_Catherine L. Dalton_____ Notary Public

My commission expires: _7/25/2012_____

CATHERINE L. DALTON
NOTARY PUBLIC
ROWAN COUNTY, N.C.
My Commission Expires 7-25-2012

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
JACKSON DIVISION

In re:                                          )
                                                )
PREVALENCE HEALTH, LLC                          )        CASE NO. 09-0216-ee
                                                )        Chapter 11
        Debtor                                  )
                                                )

AFFIDAVIT
Of
Jonathan A. Post

NOW COMES the affiant who avers and says under oath as follows

1. I am the Chief Operating Officer of two pharmacies in North Carolina, one of which is
a mail order pharmacy named MedExpress Pharmacy, Ltd. ("MedExpressNC").

2. I am not a pharmacist.

3. I am familiar with the rules and regulations necessary to open and operate a pharmacy.

4. I have been involved in the acquisition of two pharmacies and the physical movement
of my pharmacies three times.  MedExpress was not required to obtain new a new pharmacy
permit when I've moved my pharmacies.

5. An entity has been established in Florida known as MedExpress Health of Florida, LLC
("MedExpressFL.") to acquire certain assets of the Debtor. I am a member of MedExpressFL.

6. At this time, I do not own and am not affiliated with a pharmacy in Florida.

7. I am aware of the conversations and communications my brother, David Post, has had
in connection with this transaction and am intimately involved in the process and the transition.

8. During September 2009, I talked to Rebecca Poston, R.Ph., Executive Director of
Pharmacy Services at the Florida Board of Pharmacy, several times to discuss the rules and

regulations that MedExpressFL would face if it were operating pursuant to a special power of attorney. She told me and was informed it will require approximately 45 to 60 days to process an application for MedExpressFL.

9. In my experience, the process of opening or transitioning a pharmacy requires, among other activities, the following:

a. Obtaining a location in which to operate;

b. Fixing up the location to ensure proper workflow for the particular type of pharmacy and to meet the requirements of the Board of Pharmacy;

c. Hiring a pharmacist licensed in the State of Florida to serve as the "Pharmacist in Charge," which includes interviewing, checking job histories, and obtaining criminal background checks for which we use a company known as Intelius. In addition, any such pharmacist who might wish to accept an offer that we would make invariably must give notice of termination to his or her existing employer.

d. Hiring and training a variety of personnel which includes interviewing, checking job history and performance and references, and obtaining a criminal background checks for which we use a company known as Intelius.

e. Getting finger prints of the Pharmacist-in-Charge and the principal business owners and having them approved by the Board of Pharmacy.

f. Filing an application with the Board of Pharmacy for a permit;

g. Filing applications with various state and federal governmental agencies for permits and licenses;

h. Undergoing a site inspection by the Board of Pharmacy;

i.  Ordering and getting inventory in place AFTER the Board of Pharmacy site
    inspection;

j.  Establishing contracts with hundreds of insurance companies and other 3rd party
    payers;

k.  Installing computer systems;

l.  Installing pharmacy software on the computer systems;

m.  Installing telephone and security systems;

10. Without any assurance that it will, in fact, be approved by this Court as the acquirer of
the Debtor's Florida assets, MedExpressFL could not reasonably have been expected to
undertake or obligate itself to any of the activities listed above.

11. I have participated in a number of telephone calls with Stillwell who has assured my
brother and me that the Debtor could assign to MedExpressFL its Florida permits pursuant to a
special power of attorney and move to any location in Florida. He never indicated that there was
a problem moving the pharmacy and never told us that we would be required to operate in Davie,
Florida until our company obtained its own permits.

12. On August 24, 25, and 26, I visited the Debtor's facilities and operations in Jackson,
MS, Zachary, LA, and Davie, FL and engaged in conversations with certain officers and
employees of the Debtor. Both Debtor and MedExpressNC use a business model in which they
call their patients approximately 10 days in advance of shipment of their monthly medications. I
asked and Debtor's officers and employees promised to assist me with a transition of the
Debtor's patient files if I decided to acquire the Debtor's Florida operations. Among other
promises, Debtor's officers and employees said that they could "just make a few calls" and have
pharmacists and pharmacy technicians available to work immediately. Based on assurances that

we would be able to move the pharmacy to a new location, I initiated the process of getting quotes from moving companies to move the furniture and equipment to central Florida.

13. On August 28 and 29, 2009, I made several efforts to communicate with Debtor to set up a transition schedule, but received no response.

14. On September 1, 2009, Debtor's counsel, Debtor's CEO (who is also a bidder for some of the Debtor's assets), counsel to the Creditors' Committee, Stillwell, David Post, I, and various other parties engaged in a conference call to address my concerns about a transition. During that call, Stillwell, Debtor's counsel, and counsel to the Creditors' Committee informed MedExpressFL that:

    a.  MedExpressFL would be required to operate with the Debtor's pharmacy permit out of Davie, Florida until MedExpressFL could obtain its own pharmacy license from the Florida Board of Pharmacy. (Stillwell now states that he "assumed" that MedExpressFL intended to do operate though, upon information and belief, David Post had informed him that he was in central Florida looking for a location to site MedExpressFL and making arrangements for the movement of furniture and equipment.)

    b.  The added cost of operating out of Davie was "just a cost of doing business."

    c.  MedExpressFL could operate a pharmacy in Florida using Debtor's permits and licenses with "a special power of attorney with no problem."

    d.  A transition could not begin until the Sale Motion on September 16, 2009.

    e.  All that had to be done was to "hit the switch" and MedExpressFL could begin to fill prescriptions out of Florida the day after the Closing Date.

    f.  Debtor's employees were too busy to assist MedExpressFL in a transition;

g.  Debtor would contact the patients and transfer the files for fulfillment on the date of closing.

15. During the conference call of September 1, 2009, David Post and I said that a pharmacy transition could not be done in fourteen days but Stillwell and some of the others on the call insisted that it was "not a problem."

16. On September 3, 2009, I called the Florida Board of Pharmacy to inquire about any necessary filings would be necessary to operate MedExpressFL with a special power of attorney from Debtor, to re-open the Davie, Florida facility on a temporary basis, and to understand the mechanics involved in operating in one location while applying for a permit for another location. Dinah Skrnich at the Florida Board of Pharmacy told me that Debtor's pharmacy license had been revoked because it had not been suspended properly and that it could not operate a pharmacy in Florida without applying for a new permit in the same manner as MedExpressFL would have to apply for a new permit.

17. On September 9, 2009, counsel for Debtor, counsel for the Creditors' Committee, Stillwell, David Post, I, and others engaged in another conference call to address both transition issues and a reason for having closing on September 30 as opposed to a later date. The only explanation for closing on September 30, 2009 was that "it had to be done by then." During that call, I mentioned that Cardinal Health (MedExpress' primary vendor) professionals informed us that a 14-day transition was not possible. Stillwell said that he had been Director of Acquisitions at Cardinal and that he had done it hundreds of times. After that call, I called Cardinal to ask if Stillwell had been Director of Acquisitions and was told that he had never worked for Cardinal, and was never Cardinal's Director of Acquisitions, though he may have worked for its franchise system known as The Medicine Shoppe.

18. During September 2009, I spoke with Jimmy Neil, VP for Transition and Strategy for Cardinal Health Systems, the primary supplier for MedExpressNC. He told me that a new pharmacy cannot be opened or transitioned within 14 days. He sent me the email that is attached hereto.

19. During September 2009, I talked with Steve Wubker, President/CEO of Transaction Data Systems, the licensor for RX30, the pharmacy software MedexpressNC uses and that MedExpressFL expects to use. He told me that it typically takes 4 to 6 weeks to install RX30.

20. During September 2009, I met with Don Lambert, former Director of Health Business Development for the southeastern United States for Walgreens who has been involved with the transition of pharmacies for approximately ten years. He told me that it was not possible to start or transition a pharmacy within 14 days.

21. MedExpressFL has received no cooperation from Debtor with respect to a transition.

22. In my opinion and based on my experience, it is not reasonable or possible for MedExpressFL to take over the Florida pharmacy operations from Debtor under the current circumstances within 14 days. In my opinion it will require, if everything goes right, at least 45 days to get a new pharmacy operational.

## VERIFICATION

I, Jonathan A. Post, after first being duly sworn, deposes and says: That I am the affiant in the attached affidavit. I have read the affidavit and know the contents thereof and the same is true of my own knowledge, except as to those things and matters stated on information and belief, and as to those, I believe them to be true.

Jonathan A. Post

State of North Carolina
County of Rowan

SWORN TO AND SUBSCRIBED TO BEFORE ME, by Jon Post, this, the ___11th___ day of September, 2009.

_Catherine L. Dalton_  Notary Public

My commission expires: ___7-25-2012___

> CATHERINE L. DALTON
> NOTARY PUBLIC
> ROWAN COUNTY, N.C.
> My Commission Expires 7-25-2012.

**From:** Neil, Jimmy [mailto:Jimmy.Neil@cardinalhealth.com]
**Sent:** Thursday, September 10, 2009 5:46 PM
**To:** Jon Post (MedExpress)
**Subject:** Opinion

I am writing this letter in response to your request for a profession opinion regarding the reasonable expectations of time for the transition of ownership of Prevalence Health's Davie, Florida pharmacy to your ownership.

First, no two transitions of pharmacy ownership are alike and each transfer of ownership is unique. Nonetheless, it is my understanding that you have come to an agreement to acquire the assets of this pharmacy that is no longer operating as such in Davie, Florida. It is also my understanding that the Florida State Board of Pharmacy has revoked the pharmacy license and that all employees have been terminated as the pharmacy isn't operating. I am under the assumption that the DEA, Florida State Medicaid Provider Number, National Council for Prescription Drug Programs (NCPDP) Identification Number, National Provider Identifer (NPI) are still valid and that a power of attorney "specific" to you acquiring the pharmacy assets and operating it as an ongoing entity will not meet any obstacles.

In my opinion, you will not be able to operate the pharmacy as a revenue generating operation for at least sixty (60) days from the date of this letter.

The following are critical factors that must be accomplished prior to your first day's operations:

1.   Apply and successfully obtain a Florida State Board of Pharmacy license. Typical time to apply and receive is 60 days.

2.   Purchase and install a pharmacy management system (hardware and software) that is complimentary to Med Express' current pharmacy management systems. Rx30 is one such pharmacy management system and one Med Express is familiar with and one that requires little training. Hardware can be ordered and received within 14 days, software installation, including the successful transfer of patient data files from the existing ScriptMed pharmacy management system is completely dependent upon the seller of such software. Estimate 14 days from the time that Rx30 physically appears at the location.

3.   Recruit, interview, perform necessary due diligence (background check), train and onboard a Pharmacist, a few pharmacy technicians and pharmacy clerks. Estimate time is 30 days. There exists a significant shortage of pharmacists and the demand in Florida for pharmacists is on of the highest in the country.

4.   Successfully obtain the rights to operate on the pharmacy premises of said location as per all applicable licenses.

5.   Notify all Pharmacy Benefit Management Plans (3rd Parties) via your NCPDP Identification and NPI number that your are part of a Pharmacy Services Administration Organization (PSAO). This is critical for your reimbursement by 3rd Party Plans including Medicare Part D plans. Estimated time is not less than 45 days.

6.   Apply for a line of trade credit with a pharmaceutical wholesaler, submit required information and participate in wholesaler due diligence for credit approval. Order initial inventory and place into stock. Estimated time is 21 days.

7.   Purchase and install adequate security systems. Depending upon the workload of the pharmacy security system being acquired.

In summary, any of these seven (7) critical success factors must be pursued in parallel and must encounter little obstacle. If this is the case and no material obstacles are introduced, then the successful transition of ownership and establishment of operation as a pharmacy can be achieved in 60 days from the date of this letter.

Sincerely,

Jimmy

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
JACKSON DIVISION

In re:                                                )
                                                      )
PREVALENCE HEALTH, LLC                                )        CASE NO. 09-0216-ee
                                                      )        Chapter 11
        Debtor                                        )
                                                      )

AFFIDAVIT
Of
Donald E. Lambert

NOW COMES the affiant who avers and says under oath as follows:

1.  My name is Donald E. Lambert.

2.  I was Director for Walgreens for three years. For two of those years I served in a business
    development role with direct responsibilities for acquiring and starting new pharmacies. I am
    currently a consultant assisting the transition and startup of pharmacies.  I have been
    involved in pharmacy development for 11 years.

3.  In my experience, the buyer and seller of a pharmacy need to work closely together for a
    period of several months prior to an actual closing to assure a workable transition.

4.  Typically, the startup of a new pharmacy requires 60 to 90 days to put together all the
    necessary operational facets including, but not limited to, finding and setting up a location,
    hiring and training professional and support personnel, obtaining approval for all required
    licenses and permits, installing necessary computers and software, and securing contracts
    with providers.

5.  I am familiar with MedExpress operations in North Carolina and understand that it is very
    similar to the Prevalence operating model which requires the ability to contact patients
    approximately 10-14 days prior to prescription fulfillment.

6.  In my opinion, it is not possible for a new pharmacy operating as MedExpress intends to do
    in Florida to be established and properly operational within 14 days.

VERIFICATION

I, Donald E. Lambert, after first being duly sworn, deposes and says: that I am the affiant in the attached affidavit; I have read the affidavit and know the contents thereof and the same is true of my own knowledge, except as to those things and matters stated on information and belief, and as to those, I believe them to be true.

Donald E. Lambert

State of Florida
County of ____DUVAl____

SWORN TO AND SUBSCRIBED TO BEFORE ME, by Donald E. Lambert, this the ___11th___ day of September, 2009.

_____
Notary Public

My commission expires: ___8/20/2011___

AUDRA L. BOYD
Comm# DD0706553
Expires 8/20/2011
Florida Notary Assn., Inc

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
JACKSON DIVISION

In re:                                                    )
                                                          )
PREVALENCE HEALTH, LLC                                    )        CASE NO. 09-0216-ee
                                                          )        Chapter 11
            Debtor                                        )
_____          )

AFFIDAVIT
Of
Steve Wubker

NOW COMES the affiant who avers and says under oath as follows:

1.      My name is Steve Wubker.

2.      I am President / CEO of Transaction Data Systems, the licensor of pharmacy dispensing
and patient management software known as RX30.

3.      Typically, we allow and prefer 6 to 8 weeks from the time we enter a contract until our
software is ready to begin dispensing drugs

4.      MedExpress Pharmacy in North Carolina in a client of ours.

5.      For existing clients the typical installation time is 4 to 6 weeks and at this time, we are
very busy.

6.      In my opinion, it is not possible to transition a pharmacy within 14 days.

VERIFICATION

I, Steve Wubker, after first being duly sworn, deposes and says: That I am the affiant in the
attached affidavit. I have read the affidavit and know the contents thereof and the same is true of
my own knowledge, except as to those things and matters stated on information and belief, and
as to those, I believe them to be true.

_____
Steve Wubker

State of ___Florida___
County of ___ORANGE___

SWORN TO AND SUBSCRIBED TO BEFORE ME, by Steve Wubker, this, the __11__ day of September, 2009.

_____ Notary Public

My commission expires: ___4/3/2010___

MARIA G. SONKSEN
Comm# DD0534456
Expires 4/3/2010
Bonded by (800)432-4254
Florida Notary Assn., Inc.

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
JACKSON DIVISION

In re:                                          )
                                                )
PREVALENCE HEALTH, LLC                          )      CASE NO. 09-0216-ee
                                                )      Chapter 11
       Debtor                                   )
                                                )

AFFIDAVIT
Of
Mike Halfen

NOW COMES the affiant who avers and says under oath as follows:

1.     My name is Mike Halfen.

2.     I am a pharmacist the Director of Pharmacy of Gulf Medical pharmacy in Florida.

3.     I have been involved with the sale or start up of four pharmacies in Florida.

4.     In my experience and professional opinion, from the time the parties enter into an
agreement, it requires at least 90 days to open or to transfer the ownership of a pharmacy in
Florida when the parties are working closely together. Maybe the process can be reduced to 60
days if everything falls into place. If the parties are not cooperative, it can take 6 months or
more.

5.     In my opinion, it is not possible to set up a new pharmacy in Florida within 14 days.

VERIFICATION

I, Mike Halfen, after first being duly sworn, deposes and says: That I am the affiant in the
attached affidavit. I have read the affidavit and know the contents thereof and the same is true of
my own knowledge, except as to those things and matters stated on information and belief, and
as to those, I believe them to be true.

Mike Halfen
# 415-559-6/-244.0
∦ 7.4.12

State of _FLORIDA_
County of _SANTA ROSA_

SWORN TO AND SUBSCRIBED TO BEFORE ME, by Mike Halfen, this, the ___11___ day of
September, 2009.

_____ Notary Public

My commission expires: ___11/14/09___

NOTARY PUBLIC-STATE OF FLORIDA
Carol Bailey-Stewart
Commission # DD483154
Expires: NOV. 14, 2009
Bonded Thru Atlantic Bonding Co., Inc.